May it please the Court? Yes. Counsel, I'd like to reserve three minutes for rebuttal. Government has conceded that the present-sense impression error to that central part of the case of a van fleeing away from a one-way-in, one-way-out road from the McKee residence was error. The question is, can the government sustain its burden to show that it's more probable than not that the error was harmless? And I say no. The foundation of this case was no proof, cannot prove, cannot exclude equals not guilty. These facts indicate that it was not harmless. First, it's extremely rare that you would have two knives with blood and not have two attackers. Second, Alonzo Smart was outside of the house based upon Lakeisha Crusher's testimony. Counsel, isn't there a more simple reason why that particular statement's exclusion was harmless because Mr. Crutcher testified about the van? Your Honor, he all that Mr. Crutcher could testify about was seeing taillights. And so in the opening statement, I mentioned that we would have an eyewitness with seeing taillights. Well, he said, you saw a vehicle driving away from Nelson McKee's house, and so forth. Yes. Well, I think he assumed that the taillights were to a vehicle. Well, we had this the to answer the question, it was during the 911 call where What did you see when you peeked out the window, sir? I saw a vehicle leaving the residence. So I guess regardless of what other evidence, this same information came to the jury another way, didn't it? Well, sometimes who delivers the information in a trial matters. Lakeisha Crusher was called by the government. It was on cross-examination. She heard the statement contemporaneous with the 911 call. And if the Court looks at the record, Chad Crutcher was called by the defense. Both the Court and the government went after him. And in addition to the harmlessness, Your Honor, not only did they exclude the evidence, but then they put on the FBI agent to put in rank hearsay that was that he testified there was no vehicle, even though he would have no perception of that. Second, he testified that Mr. Smart went out the back window because he knew the police were coming. All of this in the context of the van matters because the van allows someone else in addition to Mr. Smart. And so to say that in a murder case for which there is no direct evidence Well, but you have two witnesses who would say the same thing. One of them testified about it. So I guess I just have trouble seeing that it wasn't available to be argued the way you're arguing it now. Well, it could not because it was excluded from Lakeisha Crusher, who was not impeached by the government, not gone after in terms of a witness. And so they were what the government did here on the harmlessness is exclude obvious present-sense impression, use the case agent to call rank hearsay, and then keep and then go after Chad Crutcher in his testimony. He was not in the same position to see where the car was leaving from. And so he testified under the judge's questions that he could only see it down the road. And so there was a lot made of the fact that he couldn't see it where the house, where Lakeisha Crusher was listening to Brittany Abel as she saw the car leaving. So in addition to that, you have Brittany Abel, who obviously is hiding from the FBI, has a motive here, and the whole Alonzo Smart mystery as to him being outside is never addressed. And so that was central to a case where you have two knives used with blood in an attack where Nelson McKee has no blood on his shirt, no blood on his shorts, no blood inside the house other than direct drops of blood, so no castoffs. But your expert was like two assailants would never put the two knives together here. Your theory is it's a suicide. She wrote the note. She was despondent. I mean, it's not con — where are you going with these two theories? Two theories are that it was the government's burden to prove a case beyond a reasonable doubt. Fair enough. You could not exclude suicide. There was evidence that suggested suicide, including that. There was also evidence that suggested two attackers. So his opinion was the two knives were consistent with two attackers or suicide, but not a single attacker, was what he testified to. Two knives in general was consistent with two attackers, but not when they're placed next to each other on a table. That's more like suicide. Agreed on that one fact. Then there were the absence of any castoff in the house suggests that it could have occurred outside with two attackers. Then you drop the knives inside the house. You blame the person who's there, and you flee away in the van. That's why the van is so important when you have someone outside of the house. So I agree. This is not a case where I could show up on the defense and prove one theory. But it is an acceptable technique to say, as the trial judge said, you have to prove beyond a reasonable doubt that you can exclude both of these theories, and they did not. And that's why it's not, at this stage, harmless error. It's conceded to be error. And the only question is, is it harmless? The judge then lets in the case agent, testifying that there's no vehicle. The judge lets all this in, then decides to let Lakeisha Crutcher's statement come in, then reverses himself. The jury was, at this point, this critical evidence was not there for me to argue in closing, like I could have if I said, Vonnie Curtis, she was called first. She gave us how drunk Nelson McKee was after drinking a gallon of whiskey. Lakeisha Crutcher, the government called her first. And she heard Brittany Abel see that van fleeing from the scene. The government can't exclude those. And I agree with the court's question, that if it was my burden on the other side to prove it was two attackers, I couldn't get there. If it was my burden to prove that those notes, tears like this will always fall, and then right where the tear falls is where the cut is on the cheek. There are evidence that suggests all three outcomes. And if you cannot prove and you cannot exclude, that would be a not guilty. We're not here on sufficiency. We're here under the Oaxaca standard. And going back to those cases, in Oaxaca, we had direct evidence of a one-pound call on a telephone. We had direct evidence from an informant testifying that he sold drugs, and the search was bad. And I know that there was a dissent in the case from Judge Graber, but I'm pointing that out only because that's a whole lot better evidence than the government has here. And that was found not to be harmless, and it was reversed. In Morales, the Umbach case, we had testimony that someone was a really bad bookkeeper from the expert, and then others brought in testimony which was, no, she's gone to professional courses. She's a really good bookkeeper. That was found not to be harmless on a same standard as here. So moving on to the search, unless there's any questions, the search issue, we have two issues. One, there was no emergency. This is not an exigency case. The emergency is a caretaker function. And the caretaker function is, is there someone going to be inside the house who you have personal observations is hurt? So you think the trail of blood isn't enough to follow the trail of blood? Under the Drugger case, no. Because once McKee came to the door and they could see him, and he was not hurt unlike Michigan v. Fisher or unlike the personal observations in the Brighton City case. So Drugger was a case where they followed a trail of the door, the key was inside the door, they turned the key, they opened the door, and then they say something and Drugger says, I'm coming out. And the court reversed and said at that point, there was no ability to go inside. So there was no personal observations for any emergency in this case to allow entry. Moving on to the consent, the prosecutor who called the three witnesses said there wasn't consent. He didn't argue it in his briefs. He argued with the judge. And the findings themselves are completely inconsistent. The findings that the Court made --" Sotomayor, well, he said he may have been too intoxicated, but then went on to explain that he could talk rationally to them and open the door and so on and so forth. He conversed. Well, his finding, Your Honor, I wanted to wait until you finished, was with respect to oral consent, he probably --" it was probably so. Probably so is not unequivocal and specific freely and voluntarily under the Shabu standard. Mr. McKee may have said, sure, may have said, come in. May have said is not sufficient. And likely orally consented there to their entry. Those factual findings are simply not consistent. And if the prosecutor who's called the witness tells the judge he doesn't have consent, that's pretty good evidence that there's a mistake to be made. Well, the district --" I'm sorry. The district court --" the district court's order isn't that equivocal. He says, you know, that the --" he was intoxicated. Nevertheless, his statements were the product of rational intellect and so on. He was able to follow orders. He provided cogent answers and gave examples of that. And so it's not that equivocal. He kind of adopted Officer Menard's testimony that McKee said something to the effect of, come on in, and said there's nothing to confirm it, but there's nothing to refute it, so he adopted it, didn't he? Well, nothing to refute it would be clear error here because standing right behind him is Kyle Negus, who said, I never heard him consent to anything. Well, not hearing is not saying he didn't say it. That's like saying, I didn't see whether the light was green or red is kind of, so what? He didn't hear anything, but it doesn't mean it didn't happen if the other person heard it. All I'm saying is that the finding itself, I understand that the two individuals who are there heard no consent. The person who asked for consent was Casey Negus, who originally asked, and then what he saw was questioning and them walking into the door, and Kyle Negus testified that what Mr. McKee had to do as the door swung in, he had to move out of the way and they were questioning him as he walked in. So I don't believe that those findings are specific and unequivocal when it's on a sure, come in, you may have said that. You have to make a finding that that was what was said. I'm reading from something where it was quite unequivocal, the findings in the written order. And, Your Honor, I'm going back to EOR 1709, 1710, where the judge says, and the finding on whether he orally consented is probably so. I don't believe probably so is sufficient. And with that, I'd reserve the rest of the time, unless the Court wants me to answer the question further. Thank you, Counsel. Good morning. May it please the Court, Adam Flake for the United States. With respect to the issue of consent, on ER 130, the district court said, the court finds no reason to disbelieve Officer Maynard's testimony that he asked for consent to enter defendant's home and that the defendant responded affirmatively by saying something by saying something and returning to his home. The video is not shown conclusively that the defendant consented, but also does not show that he did not consent. The district court made a finding of fact, and he certainly conceded that he stated it in an interesting way. He said probably so and maybe so. But I think that the Court should not equate the district court's unusual language for its finding with a finding that somehow McKee's consent was equivocal. Those are two different things. The district court's finding was that his phraseology was interesting, but the district court didn't find that McKee was waffling when he said that the officers could come in. He said Nagus didn't capture it, video doesn't capture it, but I believe Officer Maynard's testimony that he asked for consent and Maynard and McKee gave it. Well, it's sort of, you know, we've said in shabu that the consent must be unequivocal, specific, freely given, freely and intelligently given. There must be convincing evidence the defendant has waived his rights. There must be clear and positive testimony. You have some positive testimony and then the finding that says, that's probably right. It's a — it may not be clearly erroneous, but it's kind of tough to sustain. As I said before, Your Honor, the Court's phrasing was interesting, but I don't think that the Court found that the consent itself was equivocal. With respect to the — I also think that the Court actually made three findings or upheld it on three different bases. One was consent was expressed, one was consent was implied, and the final was the entirely alternative theory of exigency. And I think that each of those was correct. The trail of blood across the snow and blood on the doorstep, I think, was — combined with somebody who had just left the house literally dying, not dressed for the weather, was certainly sufficient to create a reasonable belief for the officers that they needed to look inside further and determine whether anyone else was inside dying. I think they would have been extremely remiss to take the time that it took to search a house where they had a victim literally dying across the way. Perhaps. But how do you distinguish Duggar, then? I think the police had more information available to them in Duggar. They talked to the victim. They didn't have a reasonable belief that anyone else was inside. And here they simply — they couldn't talk to the victim. She was dying. They got to a bloody door. They did not know who was in the house. I'd also note — I apologize for not pointing this out in my brief, but one of the very first things that they asked — the police asked the McKee on his doorstep was, hey, Nelson, what's going on? And his response was, nothing. Somebody had just left the house dying. There was something going on. That was not enough of an assurance. If he had said, oh, I — you know, my wife just got stabbed and ran out, and let me help you out, but everything in here is cleared up, maybe it'd be a closer case. But the answer they got was nothing. And then they asked, why is Cheryl bleeding, and got no response. And got in — yes, and got inconsistent responses, and I was cutting something. Well, she must have cut herself. They were not able to — in Duggar, they were able to assure themselves by talking that — or they should have reasonably been able to assure themselves by talking that there wasn't a good reason to skip the warrant requirement, basically. But in this case, I think it's clear that what they did was quite obvious. The sort of behavior that we would like to encourage from the police, not discourage in this particular case, didn't turn out that there was anyone in the house, of course. But in light of all of the circumstances, I think they had a very well — very reasonable belief that they needed to act with all possible speed. What about the exclusion of the present? What about when they do go in, and they see that the house is clear, and there is no emergency? Can they stop and get a warrant then? They looked around the house briefly, and once they had looked around the house briefly and seen the evidence in plain view, the court did suppress some statements and things subsequent to that, and there was litigation over at what point the emergency stopped. But I don't understand their argument to be that we — the police properly entered and should have stopped before they stopped. I think the argument was that they never should have. Sotomayor, we shouldn't have entered at all is the argument. That's correct. Do you want to get to the present-sense impression, exclusion? Yes, Your Honor. To be very clear, we are conceding that that was error. As I pointed out in my brief, they were allowed to get in similar evidence from Chad Crutcher that he saw taillights driving away. I'd also like to point out that the theory that with respect to the taillights and Alonzo Smart doesn't make a lot of sense. The houses are 80 yards away. Somehow a car came and Alonzo Smart went outside and rode in the car for 80 yards and then got back out of the car and then was nearby and got picked up on his way out anyway. And again, they were allowed to make this argument anyway. It didn't wash with the jury. They found McKee there. He came and sat down next to two bloody knives. He gave inconsistent stories. He had his victim's blood dripped on the top of his sock. I think that while concededly it was error, I think it was harmless. If the Court has no other questions, I'll conclude. Thank you. Thank you, counsel. With respect to the entry into the house, the emergency didn't require them to sweep the house. In the beginning, they all sat at the table. And in fact, more than three to five minutes went by before they even went around into the house. So their actions show that it was not an emergency by looking throughout the house. With respect to the type of questionings the Court asked, the Drugger decision, how can we distinguish it? We cannot in terms of this case. For the first 14 minutes of that case, no one was concluding anything. And in fact, BIA Agent Maynard, 14 minutes into the case, says, I can't figure out whether she stabbed herself or she got stabbed, so the only thing I'm arresting you on is possession of alcohol. So clearly it isn't the more serious situation in that they were still trying to figure out what happened. Only upon news that there was a fatality and Kyle Negus going back over the house and coming back did they move to a more serious situation. So I don't believe that the entry into the house can be withstood on either consent or an emergency. With respect to the harmlessness on the present sense impression, sometimes quality of evidence is more important than quality. And so quantity here, the Court is saying, well, you got that in through Chad Crutcher. But actually seeing the van was more important. And the theory isn't that he somehow, he was gone from 930 to 10 and he was gone for two hours and the only testimony was they picked him up on the road after they were released from the house at around 1230 at night. That should have been given to the jury. Thank you. Thank you. The case has started to be submitted for decision and we will be in recess for 10 minutes.
judges: Thomas, Graber, Lasnik